J. R. CHAMPLIN *vs.* J. G. PHELPS STOKES.

DECEMBER 31, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. This is an action of assumpsit, which was tried on an amended declaration of two counts. The first is for the breach of a written contract dated September 8, 1921, by which the plaintiff agreed to sell and deliver to the defendant, and the defendant agreed to purchase from the plaintiff, certain articles of personal property at the total price of $2368, to be paid by installments, in a manner described in the contract. The second count is in indebitatus assumpsit for work performed and materials and merchandise furnished by the plaintiff to and for the use and benefit of the defendant.

At the conclusion of a jury trial in the superior court, a verdict for the plaintiff for $6000 was returned. The defendant filed a motion for a new trial, in which the only grounds that need concern us are that the verdict is against the evidence and the weight thereof; that it is against the law; that the amount of it is excessive; and that it does not do substantial justice between the parties. This motion was denied by the trial justice; and the case is now before us on the defendant's bill of exceptions, setting forth an exception to the denial of this motion, four exceptions to the refusal of the trial justice to charge the jury as requested by the defendant and one to a ruling on the admission of evidence.

Before the trial the plaintiff filed a bill of particulars in three groups of items. In the first group, under the heading

"September, 1921" are set forth various articles of personal property and materials amounting to $111.60 and an item of $3.00 for labor, the total being $114.60. The plaintiff testified that these items were ordered from him by Captain Cruickshank, who was a witness to the defendant's signature on the above contract and had brought that contract to the plaintiff. The plaintiff could not say whether the order was given before or after the execution of that contract.

The evidence showed that Captain Cruickshank was, at or about the time of the order, in the employment of Land Reclamation Company, Inc., which we shall hereinafter refer to as the corporation; and that he was at some time employed by the defendant. But there was no evidence that at the time of the order in question he was in the employment of the defendant or that the defendant in any way authorized him to order these items from the plaintiff. We therefore need pay no further attention to them.

The next group of items in the bill of particulars is put under a heading, "June, 1922" and consists of four items of articles alleged to have been sold by the plaintiff to the defendant and aggregating $595, an item of "Labor paid to Frank Mosner $57.20," and one of "Salary from July 1st to Dec. 31st, $1800.00." The plaintiff's claim is that these items are for articles furnished, money paid and salary earned by him under agreements between him and the defendant. The defendant contends that they were not covered by agreements with him, but that if the plaintiff was entitled to be paid for these items—which the defendant denied as to the salary item—it was by virtue of agreements between the plaintiff and the corporation. This is the most important issue in the case.

The third group is for the articles sold by the plaintiff to the defendant under the written contract of September 8, 1921. The defendant does not deny that these articles were thus sold and were delivered or that the total purchase price of them was, as stated, $2368. The contract provided that a

total of $500 should be paid by the defendant in cash in certain installments, as deliveries were made; and there is no dispute between the parties that these installments were paid.

The contract provided that the balance of $1868 should be paid by the defendant "by paying the net proceeds as received by the said Stokes on the sale of the lumber, poles and cordwood cut and removed by him from his property at the said Indian Cedar Swamp." It also contained further provisions as to how the net proceeds should be calculated and as to the method of paying this balance. The final provision was to the effect that if the balance was not thus paid within six months from the date of the contract, the defendant should pay interest, at the rate of six per cent, on the unpaid balance from the end of the six months until payment in the manner provided should be offered to the plaintiff.

There is dispute between the parties as to the meaning of the provisions for the payment of the balance of $1868 and as to whether payment of this balance was offered to the plaintiff in accordance with them. It is admitted, however, that no part of this balance was actually paid and that a payment of $72 for interest on the unpaid balance was made and no other payment of interest.

In considering the second group of items in the bills of particulars, by far the most important item being "Salary from July 1st to Dec. 31st, $1800.00," a convenient starting date is February 1, 1922. At that time the defendant was the owner of considerable tracts of woodland in the southerly part of this state. Some of these he had owned for a considerable period of time and the standing wood on them also.

The other tracts he had recently bought from the corporation and the wood on them had been retained by the corporation, which had the right to remove it for its own benefit. At this time it was engaged and had for some months at least been engaged in cutting off this wood, converting it

into lumber, cordwood, poles, etc., and marketing it, the above-mentioned Captain Cruickshank being its manager in charge of these operations, which so far had not been profitable. During all the period with which we are concerned in this case, the defendant was the president of this corporation, J. R. Putnam was its vice-president, Walter Hampson was its treasurer, George H. Gilman was its secretary, and these four men and Captain Cruickshank constituted its board of directors.

Very early in February 1922, the plaintiff called on the defendant at the latter's office in New York City, to see if he could get from the defendant some more money under the contract between them of September 8, 1921, in cash or by deliveries of cordwood, lumber or poles, for sale. They had a conversation in which the defendant explained that his contract had been taken over by the corporation; that the operations under Captain Cruickshank had not been successful; and that this was the reason why the unpaid balance under the contract had not been taken care of. He stated that Captain Cruickshank had not been satisfactory as a manager and it was suggested that the plaintiff might take his place. The matter was talked over at that time, but nothing was agreed upon.

The plaintiff testified at the trial that he telephoned the defendant the next day but did not see him. The defendant testified that his first interview with the plaintiff was at the defendant's office on February 6, 1922; that the plaintiff conferred with him again the next day in the defendant's office; and that Hampson came in and took part in the latter part of the interview. Hampson's testimony was to the same effect.

On February 8, 1922, the plaintiff wrote to the defendant a letter which was not put in evidence or its contents stated. On the next day the defendant wrote the plaintiff a letter, which was introduced in evidence and the first part of which was as follows:

"I have talked over with such of the directors of the Farm Reclamation Co., Inc., as could be conveniently reached, the proposal which you very kindly made me verbally on the 7th inst., and am pleased to advise that they are very appreciative of your courtesy in the matter and very much disposed to accept your proposal. Your proposal I understand to be substantially as follows:

"In the event that the Company decides at an early date to make a change in its management at Indian Cedar Swamp, or to close down the property there until more favorable arrangements can be made for developing the same, and provided you are so notified very promptly, you will undertake to take hold of the Indian Cedar Swamp project on or before the first day of April next and operate the same without personal remuneration to yourself, for a trial period of three (3) months; the sum of $150 per week to be allowed you for payroll and expenses during the first six weeks of such period, and the sum of $125 per week to be allowed you for payroll and expenses during the succeeding weeks of such period; you agreeing that before the expiration of such three months' period, the Company will be receiving weekly returns from sale of forest products from the said tract substantially in excess of the weekly expenses incurred in producing and marketing such products and in clearing the land from which said products are taken.

"It is understood that in the event that I, personally, am satisfied that you have developed good paying business for the Company within such period, and have rendered the Company valuable service thereby, you shall receive for such service such reasonable and fair compensation as shall seem to me just and appropriate. If, on the other hand, you do not succeed in developing to my satisfaction, a profitable and steadily paying bus-

iness for the Company within such period, neither the Company nor I, personally, shall be liable to you in any way whatever."

To this letter the plaintiff replied under date of February 13, 1922, as follows:

"Answering your request of the 9th, would say I have looked over your timber enough to satisfy my mind you have about twenty-five hundred thousand feet, which should net your company $25,000, above all cost of manufacturing and delivering to market, that is, properly handled. If you have made up your minds to make a change in the management I will take it over at once, for a period of three months, and at that time you are to judge my ability and worth to your company, may it be something or nothing, but before taking charge I will have to talk with you and will go to New York at your request."

To this letter the defendant replied by a letter of February 15, 1922, the receipt of which the plaintiff admitted. The only important part of this letter was as follows:

"Replying to your favor of the 13th inst., I have talked the matter over further with such of the directors of the Farm Reclamation Co. as are conveniently accessible, and we should be pleased to meet you informally for further conference next Tuesday, the 21st inst., at one o'clock, at my office as above, if the time and place would be agreeable to you."

In accordance with this letter, the plaintiff went to New York and on February 21, 1922, conferred there in the defendant's office with all the officers of the corporation who, as above stated, were also all its directors, except Captain Cruickshank. He had not been notified of the meeting and therefore it was not a directors' meeting of the corporation. The plaintiff testified that at this meeting the matter of his taking Captain Cruickshank's position as manager was dis-

cussed, but that the only agreement that he made was with the defendant, with whom, he testified, he made an agreement before meeting the other men.

He testified that by this agreement he was to take Captain Cruickshank's position as manager and the defendant was to pay him the same as he was paying Captain Cruickshank, $300 a month, and would also pay him $300 in stock of the corporation. Later he testified on cross-examination that this covered a trial period of three months; that if his work was not satisfactory, he did not want anything, and that it was left to the satisfaction of the defendant and the corporation. He also then testified that he was to receive weekly from the corporation for the payroll and other expenses $300 for the first six weeks and $250 for the next six weeks.

Of the others who were present at this meeting, the defendant and Hampson and Gilman were witnesses at the trial and testified that an agreement was made between the plaintiff and the corporation, subject to approval at a directors' meeting, and that it was thus approved later. The agreement, as testified to by them, was substantially the same as that stated in the letter from the defendant to the plaintiff of February 9, 1922, above quoted from.

The plaintiff, on cross-examination, admitted that he received a letter dated February 23, 1922, and signed by the defendant as president of the corporation, the first paragraph of which was as follows:

"I am enclosing herewith checks of the Farm Reclamation Company, Inc., as follows: Check No. 118, in favor of J. R. Champlin, $100. Check No. 120, in favor of J. R. Champlin, Agent, $150. The first of these checks is in payment of balance of cash due under my contract with you of September 8th, 1921. The second check is an advance payment to you, as agent of this company, to be used as indicated in our conversation of 21st inst. and to be accounted for to us."

The fourth paragraph of this letter was as follows:

"It is understood between us that you will exert your best efforts to place our Cedar Swamp property upon a sound paying basis prior to June 1st, 1922, and that unless you succeed in these efforts, to our satisfaction, you will expect no personal remuneration from the Farm Reclamation Company, Inc., or from any of its officers. If on the other hand, you do succeed in developing a sound paying business for this Company from the manufacture and sale of its lumber and other timber products, prior to June 1st, 1922, then this Company is to make you fair and reasonable compensation for the service rendered, the amount of such compensation to be determined by this Company."

The rest of the letter was in harmony with what has been thus quoted from it and there is no evidence that the plaintiff before the trial ever protested to the defendant or anyone else that this letter was not a correct statement of the agreement covering the trial period of three months.

Not long after February 23, 1922, the plaintiff took over Captain Cruickshank's work as manager in charge of the operations of cutting the wood which belonged to the corporation in the section known as Indian Cedar Swamp, though he testified that he did not know that it belonged to the corporation, and converting it into lumber, box boards, poles and cordwood, and marketing them, the operations including also the laying of a railroad track into the woodland for hauling out the wood and logs to the sawmill.

He admitted, on cross-examination, that he knew that the corporation had been carrying on operations in Rhode Island; that Captain Cruickshank had been acting as its general manager in Rhode Island and that the defendant was its president. Yet he insisted that he was employed by the defendant personally and took orders only from him.

He further admitted that he opened a bank account, for his operations, in the name of "Farm Reclamation Com-

pany, Inc., J. R. Champlin, Agent," out of which the wages of laborers and other expenses of the operations as to wood belonging to the corporation were paid. Outside of the money received from the sale of the products produced, which was far from enough to cover the expenses, the deposits in this account were in the form of checks drawn in the name of the corporation and signed by Hampson as treasurer and countersigned by the defendant as president. Such checks were sent at frequent intervals, every week during the first three months. Most of them, during that period at least, were sent by Hampson as treasurer directly to the bank. Later most of them were sent in the same way, but others were sent inclosed with letters by the defendant or the treasurer.

The plaintiff admitted in his testimony that no net profits were made in the operations during the trial period of three months. Yet he said that at a visit which the defendant and Hampson made at his home in West Kingstown late in June 1922, the defendant expressed pleasure at what he had accomplished under the difficulties caused by a very wet season, and agreed by way of compromise, to pay him, for all his services up to July 1, the sum of $250. Exhibits filed prove that this was paid by a check of the corporation, inclosed in a letter of the corporation, dated July 6, 1922 and signed in its name by Hampson as treasurer.

When asked if anything was said at that meeting about the amount that he would be paid in the future, he replied: "They said they would give me $300 in money and he would give me $300 in stock." When asked, "Who said that" he replied: "Mr. Stokes." He testified that he meant that he was to receive these amounts per month; that he worked under that arrangement until the middle of the next December; and that there was due him $1800 in cash.

He testified also that there was no talk at this interview about his salary being $300 in cash, to be paid out of the net proceeds of the corporation's operations under his manage-

ment, and $300 in stock of the corporation. But he admitted that he must have received a letter of August 3, 1922 from the defendant to him and that he received and accepted the two stock certificates mentioned in it. The first two paragraphs of that letter are as follows:

"I am enclosing herewith certificate No. 22 in your favor, for 3 shares of common stock of the Farm Reclamation Company, Inc., and certificate No. 23 in your favor, for 10 shares of the common stock of that Company.

"The 10-share certificate is sent you pursuant to the understanding that Mr. Hampson and I had with you on the occasion of your last visit, on account of your services to the Farm Reclamation Co., Inc., to June 30, 1922. The 3-share certificate is sent to you on account of your services for the month of July, and is sent similarly pursuant to our understanding that $300 a month of your salary, commencing July 1st, 1922, shall be paid to you in common stock of the Farm Reclamation Co., Inc., at par. The balance of your salary (viz., $300 per month) is to be paid to you in cash, but it is the understanding of the Directors, and we think your understanding as well, that the cash portion of your salary is to be paid to you out of the net proceeds of the Company's operations under your management."

No statement was made by the plaintiff, after receiving this letter, that it was not a correct statement of the agreement under which he was to continue to operate. Meantime, in July, the plaintiff was in correspondence, as to the business which he was carrying on, with Hampson, the treasurer of the corporation, and Putnam, its vice-president, and was informed that the latter was furnishing some money to the corporation for carrying on the operations which the plaintiff was managing.

He admitted that he received a letter written to him by the defendant under date of August 17, 1922. In this letter

the defendant informed him that, in the general section where the operations were being carried on, the defendant owned the timber on certain tracts of land and he enclosed a plat of the lands which he owned, with the lands on which he owned the timber shaded blue and the lands on which the corporation owned the timber shaded red. He informed the plaintiff that he had previously provided nearly all the money that had been used by the corporation in cutting and removing its own cordwood, but that thereafter he would provide cordwood money only for the cutting of his own wood. One paragraph of this letter was as follows:

> "Such money as the Company provides for wood chopping should be spent in chopping and removing wood from the areas shown in red. Such funds as I may personally provide for producing cordwood should be used on the area shown in blue."

He asked the plaintiff thereafter to keep separate accounts covering the "blue" and the "red" cordwood and said that he would for the next two months supply money for cutting "blue" cordwood at the rate of $2.00 per cord and would be pleased to pay the plaintiff a commission of 8% (if agreeable to the plaintiff) on the proceeds of sales of "blue" cordwood after the deduction of haulage and freight, and added:

> "Your compensation for handling the 'red' wood will, I trust, be thought suitably covered by the Company's salary arrangement with you, payable half in cash and half in stock."

His letter then continued as follows:

> "If at any time doubt arises in your mind as to whether a particular lot of wood should be credited to the Company or to me, I desire such doubt resolved every time in favor of the Company.

> "I enclose herewith my personal check in your favor for $100 to be applied to the costs of cutting 'blue' wood

this week. I plan to send you $100 a week till further notice for the same purpose, on condition that my proposal as herein contained meets your approval, and on condition that you certify to me each week as to the number of cords of 'blue' wood that you have cut, and keep a proper account of receipts from sales.

"In every case, in the matter of sales, the Company's wood must be offered first, if it is available. This private enterprise of mine must in no way interfere with the business of the Company."

The plaintiff testified that he never entered into any new arrangement with the defendant, but he admitted that he received, and used for cutting the defendant's personal cordwood, the first payment of $100, which was inclosed with the letter, and that he proceeded to cut that wood. He protested that he never received any 8%. He never rejected the proposal from the defendant. On the contrary he re-plied to the above letter by a letter of August 18, 1922, the most pertinent parts of which are as follows:

"Your letter with check for $100 to apply on wood cutting on your land received. I will arrange to keep the two accounts separate.

"Do I understand that I am to bill all wood cut from your land in the name J. B. P. S. and not on Farm Reclamation Co.'s billheads, and all expenses, such as getting to mill, sawing and delivering to customers to be charged against such wood?

"As we are cutting and have been on the (blue) I will stub where we started last Monday and all cut prior to that time I understand will go to the company.

"Some of the larger trees are giving us a butt large enough to go on the Auburn order. I will also bill them out in your name. I would suggest you taking over the Chase truck as I will be able to keep it going on your wood steadily."

In accordance with instructions from the defendant, he opened a new bank account in the name of "Saw Mill Swamp, J. R. Champlin, Agent." Thenceforth he had two separate accounts and rendered separate statements for the operations on the corporation's wood and the defendant's wood. This continued as long as he continued to operate at all on the wood on any of the tracts; and he received personal checks from the defendant from time to time, which he deposited in the "Saw Mill Swamp" account and used for the expenses of cutting and handling the defendant's wood.

The plaintiff admitted that no net profits resulted from the operations on the corporation's wood or on the defendant's. Finally, for that reason, both the corporation and the defendant refused to put in any more money, and the plaintiff was discharged and ceased all operations the last of December, 1922. Meantime he had received in checks of the corporation some small payments on account of salary, which Hampson, the treasurer, testified were advances made on the expectation that profits would be realized in the future. The defendant had also made some small payments to the plaintiff on account of the 8% commission provided for in the arrangement between them as to the defendant's personal cordwood; and there is no claim by the plaintiff that anything is owed to him under that arrangement.

The only corroboration of the plaintiff's testimony that there was an agreement between him and the defendant personally, by which the defendant was to pay him a salary, was in the testimony of Alexa Henderson, the plaintiff's housekeeper, as to what she said she overheard at the conference between the plaintiff and the defendant and Hampson at the plaintiff's house in June 1922. On the other hand, the defendant's testimony that there was no such agreement and that the plaintiff was employed by the corporation as its manager and that his salary, so far as payment in cash was concerned, was to be paid by the corporation and only out of net profits of the operations carried on by him for the corporation, was strongly corroborated by

the testimony of Hampson, its treasurer, and Gilman, its secretary and by much documentary evidence in addition to that above set forth.

In our judgment the preponderance of the evidence is clearly and overwhelmingly in favor of the conclusions that there was no agreement between the plaintiff and the defendant before August 18, 1922, whereby the plaintiff was employed as manager for the defendant in operations for the cutting of timber and the handling and marketing of its products; that there was never any agreement between them whereby the defendant was obligated to pay any salary to the plaintiff; that the defendant is not indebted to the plaintiff for any compensation for services rendered by the plaintiff to the defendant for operations concerning the timber belonging to the defendant and its products or for any other services, by way of salary or otherwise.

Because of these conclusions and the meagerness and uncertainty of the evidence directly relating to the other items set forth under the heading "June, 1922" in the plaintiff's bill of particulars, i. e., other than the salary item above discussed, and the testimony of the defendant as to these items, we are clearly convinced that the plaintiff has failed to prove by a preponderance of the evidence that the defendant is indebted to him on any of those items.

The defendant's exception 6 is to the denial by the trial justice of the defendant's motion for a new trial. The hearing on this motion did not take place until nearly three years after the trial; and the trial justice, in his rescript denying the motion, stated that he had no recollection of the appearance or demeanor of the witnesses or parties in this case. He also stated that the only help he had was the following memorandum which he made at the conclusion of the trial: "Question of fact for jury, which can decide either way, depending on which side it believes. If for plaintiff, $4410 proved, with interest, has ample credible evidence to hold verdict."

He then immediately added: "The court therefore finds that the plaintiff proved his case by a fair preponderance of the evidence. The damages are not excessive. The plaintiff is entitled to receive interest on his claim, which brings the amount well over $6000, to which sum the plaintiff is limited by the *ad damnum*. Motion for new trial denied." There was no discussion whatever of the evidence and we cannot tell how carefully he considered it, particularly the documentary evidence, before he made the memorandum or whether he overlooked much of it or misconceived or misapplied it.

Under these circumstances, we cannot properly give to his decision the weight to which a decision of a trial justice denying a motion for a new trial after a verdict for the plaintiff is ordinarily entitled.

It is clear that the verdict of $6000 must have included a large amount for the second group of items in the bill of particulars and may also have included an amount for some or all of the items in the first group. For the reasons that we have above stated, we are clearly convinced that the verdict, so far as it is based on any items in the first or second group of items, is against the preponderance of the evidence and, we add also, that in our considered judgment it fails to do justice between the parties. We find, then, that the trial justice committed error prejudicial to the defendant in denying the motion for a new trial.

The defendant's exception 1 is to the refusal of the trial justice to permit the defendant's counsel to examine the defendant with regard to a letter of November 1, 1922, received by him from the plaintiff. The defendant's exceptions 3, 4 and 5 are to the refusals of the trial justice to grant the defendant's third, fourth and fifth requests to charge the jury. These requests concerned the effect to be given by the jury to the receipt by the plaintiff of the following letters respectively, viz., the corporation's letter of February 23, 1922 and the defendant's letters of August 3, 1922

and August 17, 1922, and of his accepting benefits under, and acting in accordance with, these letters respectively.

All four of the letters, with which these exceptions 1, 3, 4 and 5 are concerned, and the plaintiff's conduct with regard to them were relevant only to the second group of items in the bill of particulars. The only effect of our sustaining any or all of these exceptions would be that the defendant would be entitled to a new trial as to that group of items. Therefore, in view of the fact that we have above decided, after considering the defendant's exception 6, that the trial justice erred in denying the defendant's motion for a new trial, we see no sufficient reason for ruling on any of his exceptions 1, 3, 4 and 5.

This brings us to the matter of the plaintiff's claim under the written contract of September 8, 1921, which covers the third group of items in his bill of particulars. Clearly the jury must have found that the plaintiff was entitled to recover the admittedly unpaid balance of $1868 and the unpaid interest thereon. The defendant contends that the evidence proves that the corporation assumed the defendant's obligations under this contract and that the plaintiff was informed of this and agreed to it, thus releasing the defendant. From a consideration of the evidence we cannot say that the conclusion which the jury must have reached against this contention is not supported by the preponderance of the evidence.

By the contract the defendant, as stated *supra,* agreed to pay this balance "by paying the net proceeds as received by the said Stokes on the sale of the lumber, poles and cordwood cut and removed by him from his property at the said Indian Cedar Swamp." The remainder of the body of the contract is as follows:

> "It is agreed that the net proceeds shall be fixed by deducting from the gross receipts from the sale of the said wood the wages of the men employed in milling same and delivering to Railroad at Wood River Junction.

"In the event that not enough cordwood, lumber and poles shall be cut or milled and offered to said Champlin for sale at current market rates, to equal the balance due, estimated at $1868., or the balance due under the contract, within six months from the date of this agreement, the said Stokes agrees to pay interest at the rate of six per cent on the unpaid balance from the expiration of the said six months until sufficient cordwood, lumber and poles shall have been cut or milled and offered to said Champlin for sale at current market rates, to equal the balance due."

The defendant's other contention is that by the contract the principal of this balance was payable only out of net proceeds, calculated as provided in the contract, and made from the sale of lumber, poles and cordwood, to be offered the plaintiff for sale at current market prices; that no such net proceeds were made; that, during the period when the plaintiff was employed as manager, lumber, poles and cordwood were thus offered to him for sale in ample amounts to satisfy the unpaid balance under the contract, and were sold by him. The plaintiff testified that no such lumber, poles, or cordwood was offered to him for sale and the application of the net proceeds of the sale to the payment of the balance due him under the contract.

From our consideration of the evidence, we are convinced that the jury could reasonably and properly find in favor of the plaintiff on this issue, on a preponderance of the evidence. In view of their verdict it must be assumed, for the purposes of this case, that they have so found.

Moreover, it is not provided in the contract that the defendant is released from liability under it by a tender, by the defendant to the plaintiff, of sufficient timber products for sale to satisfy, from the net proceeds of their sale, the unpaid balance of the contract price. The provision with regard to such tender relates only to the obligation of the defendant to pay interest; and under the finding which we have just made we are of the opinion that the jury were en-

titled to add unpaid interest to the principal of the unpaid balance of the purchase price.

We are of the opinion also that the plaintiff was not required, by the terms of the contract, to wait more than a reasonable time for the payment of the unpaid balance out of the net proceeds of the sale of timber products, and that he waited more than a reasonable time before bringing the present action, which was brought on December 30, 1925.

From what we have said as to the plaintiff's rights under the written contract, it is obvious that in our opinion there is no merit in the defendant's exception 2, which is to the refusal of the trial justice to charge the jury, as requested by the defendant, as follows: "1. If you find from the evidence in this case that the defendant, Stokes, did not receive any net proceeds from the sale of lumber, poles, and cordwood cut and removed by him from his property at Indian Cedar Swamp, then the plaintiff cannot recover in this action any part of the sum of $1868."

We find that the amount of unpaid interest on the sum of $1868 from the expiration of six months after the date of the written contract to the date of the plaintiff's writ is $355.14, so that under the verdict of the jury he was entitled at the latter date to recover on that contract, in principal and interest, the sum of $2223.14, and no more. In our judgment, based on what we have previously said in this opinion, the plaintiff is justly entitled to recover from the defendant on the verdict that sum, with interest thereon from the date of the writ, and the trial justice erred in not granting the defendant's motion for a new trial on the ground that the damages found in the verdict are excessive.

The defendant's exception 2 is overruled; his exception 6 is sustained on the ground that the verdict is excessive by the amount that it exceeds $2223.14. The case is remitted to the superior court for a new trial, unless on or before January 14, 1938, the plaintiff shall file in the office of the clerk of the superior court a remittitur of all the said verdict in excess of $2223.14. In case the plaintiff shall thus file

such remittitur, the superior court is directed to enter judg-ment on the verdict as reduced by the remittitur.

*John J. Dunn,* for plaintiff.

*Clarence E. Roche,* for defendant.